In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3111

United States of America,

Plaintiff-Appellee,

v.

Tommie T. Childs,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-10004--Michael M. Mihm, Judge.

Argued November 6, 2001--Decided January 18, 2002

   Before Flaum, Chief Judge, and Cudahy,
Posner, Coffey, Easterbrook, Ripple, Manion,
Kanne, Rovner, Diane P. Wood, Evans, and
Williams, Circuit Judges.

   Easterbrook, Circuit Judge.  We took this
case en banc to decide whether
questioning during the course of lawful
custody must be related to the reason for
that custody. The panel stated that
"inquiries falling outside the scope of
the detention constitute unlawful
seizure." United States v. Childs, 256
F.3d 559, 564 (7th Cir. 2001). The full
court holds that, because questions are
neither searches nor seizures, police
need not demonstrate justification for
each inquiry. Questions asked during
detention may affect the reasonableness
of that detention (which is a seizure) to
the extent that they prolong custody, but
questions that do not increase the length
of detention (or that extend it by only a
brief time) do not make the custody
itself unreasonable or require
suppression of evidence found as a result
of the answers.

   In response to a dispatch arising out of
a hit-and-run accident, James Chiola, an
officer of the Peoria Police Department,
stopped a car driven by Tommie Childs. A
check revealed that Childs was wanted on
an outstanding warrant; his possession of
marijuana added a drug offense to that

preexisting charge. Officer Chiola did not bother to issue a citation for a third offense: the car's windshield had a spider web of cracks that may have obstructed the driver's vision, in violation of 625 ILCS sec.5/12-503(e). Chiola told Childs to get the windshield fixed. Three days later officer Chiola saw the same car on the road, with the windshield still cracked. Again he stopped the car, this time on the traffic offense alone. Childs, who had been released on bail, was in the passenger's seat. Chiola began to talk with him while his partner dealt with the car's driver. Because he was only a passenger, Childs had not violated sec.5/12-503(e) this time, but his failure to wear a seat belt violated sec.5/12-603.1(a)--and, as a passenger in a car stopped for a traffic offense, Childs was at all events subject to the officers' control and direction until their safety could be assured. See Maryland v. Wilson, 519 U.S. 408 (1997). While his partner was performing license and warrant checks on the driver, Chiola asked Childs a few questions: first why Childs had not fixed the windshield (Childs replied that it was not his car), second whether he was carrying any marijuana this time (Childs said no), and third whether he would consent to a search (Childs agreed). During the search Chiola found crack cocaine, which led to the current prosecution for possessing that drug with intent to distribute it, and to a sentence of 120 months' imprisonment. The panel held that the second question effected an unconstitutional seizure of Childs, because the traffic stop was unrelated to drugs and Chiola lacked any reason to think that Childs was again carrying drugs. It remanded for an inquiry whether this unconstitutional seizure tainted the consent given in response to the third question.

Under the fourth amendment, every search or seizure must be "reasonable," which normally entails some person-specific basis for suspicion. See Indianapolis v. Edmond, 531 U.S. 32 (2000). But the Supreme Court has held repeatedly that police may approach persons and ask ques tions or seek their permission to search, provided that the officers do not imply that answers or consent are obligatory. See, e.g., Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); INS v. Delgado, 466 U.S.

210 (1984); Florida v. Royer, 460 U.S. 491, 501 (1983) (plurality opinion); United States v. Mendenhall, 446 U.S. 544, 552-58 (1980). These requests are proper without regard to the absence of reasonable suspicion, the Court made clear in Florida v. Bostick, 501 U.S. 429, 434 (1991), because "mere police questioning does not constitute a seizure." As a result, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." Ibid., quoting from Royer, 460 U.S. at 497. See also California v. Hodari D., 499 U.S. 621, 624 (1991) (defining "seizure" as "taking possession," a category that does not comprise questioning); Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) ("A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen'") (quoting from Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).

  Most of these decisions concern questions asked of persons not under arrest (though often as a practical matter not free to walk away, see Bostick and Delgado). Are things different when the suspect is in formal custody? It is difficult to see why custody should turn an inquiry into a "seizure." Posing a question still does not meet the Supreme Court's definition of a seizure. Officer Chiola did not restrain Childs's liberty (or increase the severity of the existing restraint) by asking something that Childs could refuse to answer. Indeed, as a logical proposition, a view that custody transmutes questions into "seizures" is backward. Approaching a person on the street (or at work, or on a bus) to ask a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer); that delay could be called a "seizure," though it has not been. But a question asked of someone already in custody causes no delay and thus can't be a seizure. Given opinions such as Bostick, which dealt with questions asked of passengers on busses, there can be no doubt that an officer on an airplane in

mid-air may strike up a conversation with a person in the next seat, even though that fellow passenger could not leave the plane. Similarly an officer may interrogate a person in prison on one offense about the possibility that the inmate committed another. This is normal and, as far as we can tell, of unquestioned propriety as far as the fourth amendment is concerned, whether or not the officer has probable cause to believe that the inmate committed any other crime. The prisoner has rights under the fifth amendment and perhaps the sixth. He can refuse to answer incriminating questions and may be entitled to counsel. See Texas v. Cobb, 532 U.S. 162 (2001); Davis v. United States, 512 U.S. 452 (1994); McNeil v. Wisconsin, 501 U.S. 171 (1991); Michigan v. Mosley, 423 U.S. 96 (1975). But the idea that the police could violate a prisoner's fourth amendment rights by asking questions in search of information about other offenses has no basis in the language of that amendment or the Supreme Court's cases.

If the police may ask (without suspicion) questions of persons who are in no custody (e.g., walking down the street), people who are in practical but not legal custody (e.g., passengers on busses and airplanes), and people who are in formal custody pending trial or following conviction (e.g., prisoners such as Cobb, a pretrial detainee), then why would the police need probable cause or reasonable suspicion to direct questions to persons such as Childs who are in legal custody but likely to be released soon? To say that questions asked of free persons and questions asked of prisoners are not "seizures" but that questions asked of suspects under arrest are seizures would have neither the text of the Constitution behind it nor any logical basis under it. This is not to say that Childs cannot cite a case or two in his support. Both the eighth and the ninth circuits have held, as our panel did, that questions are seizures requiring either some relation to the basis for the custody or an independent source of reasonable suspicion. See United States v. Murillo, 255 F.3d 1169, 1174 (9th Cir. 2001); United States v. Ramos, 42 F.3d 1160 (8th Cir. 1994). These courts reached this conclusion indirectly. Their background is

revealing. Ramos traces the eighth circuit's position to United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). The panel in Cummins observed that, because the questions were related to the purpose of the stop, the suspect had no claim. Later panels then read that statement as meaning that officers may ask questions only if they are related to the stop, a logical error. The proposition "X defeats the defendant's constitutional contention" differs from "X is the only way to defeat the defendant's constitutional contention." Just the other day the Supreme Court branded as fallacious the view "that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it". United States v. Knights, 122 S. Ct. 587, 590 (2001).

Developments in our circuit parallel those in the eighth. United States v. Rivera, 906 F.2d 319 (7th Cir. 1990), remarks that the questions asked of the suspect there were supported by reasonable suspicion, and the panel in Childs's case took this as establishing the rule that questions must be so supported. That is both logically unsound, see Knights, and a poor reading of the decision--especially when many other decisions see no problem in questions asked without suspicion. See, e.g., United States v. Williams, 209 F.3d 940 (7th Cir. 2000); United States v. Baker, 78 F.3d 1241 (7th Cir. 1996). Neither the eighth nor the ninth circuit discussed the significance of Bostick and similar decisions of the Supreme Court. We thus prefer the analysis of United States v. Shabazz, 993 F.2d 431 (5th Cir. 1993), which, though brief, found the right reference points in the Supreme Court's ouevre. Shabazz holds, and we agree, that questions asked of persons involved in traffic stops are not "seizures" and thus do not require probable cause or reasonable suspicion.

This does not end the analysis. Childs was placed in custody by the stop of the car in which he was a passenger. That custody's nature and duration must be "reasonable" under the fourth amendment, so we must consider the possibility, not that each question is a "seizure," but that questioning may render the physical detention unreasonable. The best case for

such a possibility would be events similar to those in United States v. Holt, 264 F.3d 1215 (10th Cir. 2001) (en banc): A car is stopped at a checkpoint for a routine license-and-registration inquiry, a sort of seizure proper under Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), and the occupants are then detained for extra time while the police ask additional questions unrelated to the purpose of the stop. Questioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment. See United States v. Sharpe, 470 U.S. 675, 685 (1985). A majority in Holt thought that questions designed to ensure the officers' safety while the license and registration checks occur are "reasonable" within the Constitution's meaning; it is hard to disagree with that conclusion. See New York v. Quarles, 467 U.S. 649 (1984). Cf. United States v. Davis, 270 F.3d 977 (D.C. Cir. 2001). A different majority in Holt added that no other question may be asked during a traffic stop--even when the stop rests on probable cause to believe that the suspect has committed a crime. 264 F.3d at 1228-30. This was dictum, for Holt had not been stopped on probable cause or even reasonable suspicion. He had been stopped at a checkpoint without any person-specific suspicion. Our case, by contrast, does entail a stop based on probable cause to believe that an offense was ongoing, and after the car came to a halt the officers acquired probable cause to believe that Childs personally had committed an offense (failure to wear a seat belt).

Holt stated that all "routine auto stops" should be treated as Terry stops, which must be limited in time and scope. See Terry, 392 U.S. at 20; United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (same principle for a checkpoint stop not based on suspicion). Handling all traffic stops identically is at once too demanding and too lax. Treating checkpoint stops as if they were Terry stops supported by reasonable suspicion gives the officers too much discretion over drivers who arrive at roadblocks or security screening points. Treating arrests on probable cause as if they, too, were Terry stops gives the officers too little discretion. A person stopped

on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot. Probable cause, by contrast, justifies a custodial arrest and prosecution, and arrests are fundamentally different from Terry stops. Persons who are arrested may be taken to the station house for booking, even if the only penalty for the offense is a fine (as it is for failure to wear a seat belt). See Atwater v. Lago Vista, 532 U.S. 318 (2001). In other words, arrested persons (unlike those stopped at checkpoints, or on reasonable suspicion) need not be released as quickly as possible. What is more, a person stopped on probable cause may be searched fully, while a person stopped on reasonable suspicion may be patted down but not searched. See United States v. Robinson, 414 U.S. 218 (1973); United States v. Edwards, 415 U.S. 800 (1974).

The tenth circuit observed in Holt that "a typical traffic stop resembles in character the investigative stop governed by Terry more closely than it does a custodial arrest." 264 F.3d at 1230. We grant this as a factual matter, but it does not follow that the Constitution requires all traffic stops to be treated as if they were unsupported by probable cause. What is "typical" often differs from the constitutional minimum. Atwater makes this clear. A person arrested for an offense punishable only by a fine typically is given a citation (a "ticket") and released, but Atwater holds that the Constitution allows the police to place the person in custody and take him to be booked. Thus although traffic stops usually proceed like Terry stops, the Constitution does not require this equation. Probable cause makes all the difference--and as Whren v. United States, 517 U.S. 806 (1996), shows, traffic stops supported by probable cause are arrests, with all the implications that follow from probable cause to believe that an offense has been committed. See also, e.g., Dunaway v. New York, 442 U.S. 200 (1979); Beck v. Ohio, 379 U.S. 89, 96-97 (1964). A footnote in Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984), anticipated this point: "We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop." Holt declined to be guided by this

language because it was not essential to the judgment in Berkemer. 264 F.3d at 1230. But the footnote in Berkemer is hardly the last word, as Whren shows in equating traffic stops on probable cause to other arrests, and as Atwater shows in allowing extended custody for the purpose of booking and arraignment following an arrest for a fine-only offense. Cf. Riverside County v. McLaughlin, 500 U.S. 44 (1991). The police had proba-ble cause to believe that the car's driver, and Childs himself, had committed traffic offenses. That justified arrests, which make it unnecessary for us to decide whether and if so how the "scope" limitation for Terry stops differs from the "duration" limitation.

Because probable cause supported this stop, neither the driver nor Childs had a right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed. It is therefore not necessary to determine whether the officers' conduct added a minute or so to the minimum time in which these steps could have been accomplished. The panel stated: "It is undisputed that the stop was not prolonged for Chiola to question Childs; the questioning occurred while the other police officer was processing the driver of the vehicle." 256 F.3d at 564. Before the court en banc, Childs proceeded to dispute just this on the ground that the other officer briefly came around to the passenger's side to speak with Chiola and watch what was happening, a step that might have delayed the license and warrant checks. Childs may have forfeited this point by not raising it in the suppression hearing and his opening brief on appeal, but this we need not decide. The extra time, if any, was short-- not nearly enough to make the seizure "unreasonable."

Our point is not that, because Chiola could have taken Childs to a police station for booking, any less time-consuming steps are proper. The reasonableness of a seizure depends on what the police do, not on what they might have done. The point, rather, is that cases such as Atwater and McLaughlin show that the fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the

Constitution requires is that the entire process remain reasonable. Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

Any doubt about this understanding of questions during traffic stops is dispelled by Ohio v. Robinette, 519 U.S. 33 (1996). A deputy sheriff stopped Robinette for speeding. After performing the necessary administrative steps and returning Robinette's license, the deputy asked Robinette whether he was carrying any drugs. That question prolonged the custody, if only for a short time. The Supreme Court of Ohio held that the question was unconstitutional, and that matters unrelated to the purpose of a stop may not be raised until the officer had told the driver that he is free to go. But the Supreme Court reversed, holding that the fourth amendment does not require this advice. Robinette thus approves exactly what Childs says may not occur: Questions during a routine traffic stop that do not concern the purpose of the stop (and are not supported by any other suspicion), yet extend the stop's duration. The Supreme Court of Ohio thought that the Constitution requires advice; Childs, by contrast, contends that the questions are absolutely forbidden, advice or no. By rejecting the position of the state court in Robinette, the Supreme Court of the United States necessarily rejected the broader contention that unrelated questions may not be asked at all.

By asking one question about marijuana, officer Chiola did not make the custody of Childs an "unreasonable" seizure. What happened here must occur thousands of times daily across the nation: Officers ask persons stopped for traffic offenses whether they are committing any other crimes. That is not an unreasonable law-enforcement strategy, either in a given case or in gross; persons who do not like the question can decline to answer.

Unlike many other methods of enforcing the criminal law, this respects everyone's privacy. There is therefore no reason to doubt the validity of Childs's consent, which the district judge already found to be voluntary in the course of denying Childs's motion to suppress. The conviction and sentence therefore are

affirmed.


   Cudahy, Circuit Judge, concurring in the judgment.  The majority has covered a wide variety of police questioning situations in which, for an assortment of reasons, the Fourth Amendment may not impose a limitation on the scope of those police investigations. Conspicuously, however, the majority has declined to follow the course of judicial restraint and to answer, or even pose, the question that would likely make the rest of its discussion superfluous. Did Officer Chiola have grounds for reasonable suspicion that Childs possessed marijuana? For, if Officer Chiola had such grounds, he could certainly ask questions about drugs, and there would be no need to search for a broader basis for justification. The majority refuses to ask or answer this simple question based on articulable suspicion of marijuana possession even though (or is it because?) the answer would reduce the rest of its speculations to dictum. Certainly, this is not the path of judicial restraint.

   The original panel did ask the question about reasonable suspicion of marijuana possession, (which was clearly raised as an issue by the parties) and answered it in the negative--opening the floodgates for the major revision of Fourth Amendment law represented by the majority opinion. After hearing the case reargued en banc, I think that the panel opinion may have been incorrect about this issue. Only three days before the traffic stop under scrutiny here, Officer Chiola had apprehended Childs with marijuana, and the officer was struck by the palpable nervousness of Childs during the second stop as contrasted with his sang-froid on the earlier occasion. The panel treated these circumstances as presenting a "record" or criminal history of drug activity by Childs, which is ordinarily

not sufficient grounds for articulable suspicion. And, no doubt, Officer Chiola's recollection of what happened three days before is a sort of "record." The question is a close one, but the cir cumstances may have given Officer Chiola a green light to ask about marijuana. After all, the only intrusion based on this arguably reasonable suspicion was the marijuana question. See United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1995) ("[K]nowledge of . . . recent relevant criminal conduct while of doubtful evidentiary value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a Terry stop." (emphasis in original) (citations omitted)). In view of the very recent occurrence of the earlier stop, where marijuana was found, and the changed demeanor of the suspect, it would seem natural to the officer to ask the question and it may be arbitrary to deny him the authority to do so. Therefore, at least for purposes of this opinion, I will treat the question about marijuana as properly based on articulable suspicion aroused by the earlier stop. This would provide a perfectly adequate and more limited basis for affirming the district court than the course followed by the majority.

To find reasonable suspicion of marijuana possession here distinguishes these circumstances from questioning about bank robberies in the area or unsolved home invasions, as to which there would have been no articulable suspicion. There would be no basis for suspecting Childs of these crimes and they are clearly outside the scope of a detention for a cracked windshield, an unlatched seat belt, or marijuana possession. Simply on a common-sense basis, questions about bank robberies or home invasions would probably strike even a police officer as out of line in these circumstances. "Scope" is the key word here since both in Terry v. Ohio, 392 U.S. 1 (1968), and in numerous cases since that decision, the Supreme Court has prescribed "scope" as a limitation on investigations conducted during a temporary detention. The restriction based on "scope" has also been applied by the courts of appeals in innumerable temporary detention cases since Terry--

most recently in the Tenth Circuit's authoritative en banc decision in United States v. Holt, 264 F.3d 1215 (10th Cir. 2001). The majority's effort to demean the conclusions of Holt as dictum, is, with all respect, a little like the pot calling the kettle black, for the majority's reliance on the broadest ground for the present decision, although not really productive of dictum, is no more essential to the result here than were the Tenth Circuit's comments in Holt.

Holt concludes that both the length and the scope of a traffic stop provide Fourth Amendment limitations on the detention. Id. at 1230. In reaching this conclusion, the majority in Holt comprehensively analyzed the Fourth Amendment, Supreme Court precedent and Tenth Circuit precedent, as well as cases from other circuits. Holt makes a clear and compelling case for its conclusion, and I entirely agree with its reasoning and result.

The Fourth Amendment, of course, protects against unreasonable searches and seizures. A temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of a "person" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809 (1996). Thus, temporary detentions for traffic violations must not be "unreasonable" under the circumstances. Id. For a detention to be reasonable, it must be limited in duration and scope. This was made clear by the Court in Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality), where the Court said

The Fourth Amendment's prohibition against unreasonable searches and seizures has always been interpreted to prevent a search that is not limited to the particularly described "place to be searched, and the persons or things to be seized," U.S. Const., Amend. IV, even if the search was made pursuant to a warrant and based upon probable cause. The Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search: the search must be

limited in scope to that which is justified by the particular purposes served by the exception. . . . Terry v. Ohio . . . also embodies this principle: "The scope of the search must be strictly tied to and be justified by the circumstances which rendered its initiation permissible."

Id. at 500 (plurality) (internal quotations and citation omitted). That this discussion applies equally to seizures and to searches clearly follows since the Fourth Amendment applies with the same force to seizures as it does searches. See also United States v. Rivera, 906 F.2d 319, 322 (7th Cir. 1990) ("Moreover, the constitution restricts the scope of the seizure to that which is necessary to fulfill the seizure's purpose.").

"[V]irtually, all thoughtful, civilized persons not overly steeped to the point of confusion in the mysteries of . . . Fourth Amendment jurisprudence," Royer, 460 U.S. at 520 (Rehnquist, J., dissenting), would agree that the scope of a search or seizure must be part of the reasonableness inquiry. For if a man were stopped for speeding in Utah, it would not be reasonable for a police officer to ask whether he were practicing polygamy. There would be nothing in the circumstances to suggest any basis for such an inquiry even if the duration of the stop was not lengthened. The question itself would be an invasion of privacy. This is a good illustration why the duration of a traffic stop cannot be the only dimension of reasonableness. The subject-matter (or scope) dimension provides limits that are just as binding as the time (or duration) dimension.

Drawing upon the common-sense notion that reasonableness includes both a scope and a duration dimension, this circuit had held that police officers may not ask questions unrelated to the purpose of a traffic stop, unless there is an independent source of reasonable suspicion. See, e.g., United States v. Finke, 85 F.3d 1275, 1280 (7th Cir. 1996) (A police officer had sufficient reasonable and articulable suspicions of drug courier activity to justify a speedy, unintrusive criminal record inquiry after a traffic stop.); United States v. Rivera, 906 F.2d 319, 322 (7th

Cir. 1990) (Certain of the questions asked by a trooper of an individual during a traffic stop were casual banter or were justified by the trooper's reasonable suspicion.). This circuit has not been alone in its interpretation of the Fourth Amendment. The Eighth, Ninth, and Tenth Circuits are wholly in agreement. See, e.g., Holt, 264 F.3d at 1230 (concluding that both the length and scope of a traffic stop are relevant factors in deciding whether the stop comports with the Fourth Amendment); United States v. Murillo, 255 F.3d 1169, 1174 (9th Cir. 2001) ("During a traffic stop, a police officer is allowed to ask questions that are reasonably related in scope to the justification for his initiation of contact. In order to broaden the scope of questioning, he must articulate suspicious factors that are particularized and objective." (internal citations omitted)); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (holding that a police officer did not have reasonable suspicion to ask questions not reasonably related to the stop, but finding the subsequent consent nevertheless to be voluntary). Only the Fifth Circuit apparently has narrowed the scope requirement to coincide with the duration requirement. See United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993).

The majority criticizes Ramos and Murillo for failing to address Florida v. Bostick, 501 U.S. 429 (1991), and similar decisions by the Supreme Court. Slip Opinion, at 6. In those decisions, the Supreme Court approved police questioning of citizens when no detention was involved. The majority quotes Bostick for the proposition that "mere police questioning is not a seizure." Slip Opinion, at 3. But that quotation was taken out of context to support the argument that questioning can never be a seizure. For in Bostick, a bus was making a regular stopover and the case merely held that police officers could question people on board the bus about drugs. In reaching this conclusion, the Supreme Court stated in dictum that "[s]ince Terry, we have repeatedly held that mere police questioning does not constitute a seizure." See 501 U.S. at 434. The Court discussed Florida v. Royer, 460 U.S. 491 (1983), Florida v. Rodriguez, 469 U.S. 1 (1984), and INS v. Delgado, 466 U.S. 210

(1984), as cases supporting this proposition. Royer involved police questioning of undetained people on the street or in other public places. Rodriguez concerned police questioning of an individual in an airport concourse. Delgado involved questioning of workers at a factory. Significantly, the Court found the police encounters in these cases to be "the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest." Bostick, 501 U.S. at 434 (internal quotations and citations omitted.). Neither Terry nor any of the cases relied upon by the Court in Bostick stands for the proposition that police questioning, when the person being questioned is being detained (and the encounter is thus nonconsensual), is not a seizure.

The majority also finds fault with the panel decision here as well as with Ramos for making the "logical error" of equating "X defeats the defendant's constitutional claim" with "X is the only way to defeat the defendant's constitutional claim." Slip Opinion, at 5. Thus, the majority argues that United States v. Cummins, 920 F.2d 498 (8th Cir. 1990), merely held that the questions asked were authorized since they were related to the purpose of the stop, and Ramos extended Cummins to hold that questions could be asked only if they were related to the purpose of the stop. Similarly, Rivera held that the questions at issue were based on reasonable suspicion, and the panel here extended Rivera to hold that only questions that are based upon reasonable suspicion could be asked by an officer during a police stop.

But Ramos and the panel opinion are not as "illogical" as the majority suggests. First, both Ramos and the panel allowed questions to be asked that related to the purpose (or scope) of the stop or that were based upon reasonable suspicion arising independently. For example, if the officer making the traffic stop sees drugs in plain view or smells drugs, the officer can ask questions about drugs. Questions that are related to officer safety can also be asked. See Holt, 264 F.3d at 1222-23 (allowing officers to ask about firearms even if they had no reasonable suspicion of firearm possession). Second, the facts in Cummins

and Rivera led to the limited holdings in those cases. In Cummins, the initial question was related to the purpose of the stop. 920 F.2d at 502. The driver's inconsistent answer justified additional questioning. See id. In Rivera, the officer had reasonable suspicion, on which the questions were based. 906 F.2d at 322. There was no need in either case to reach the broader holding that questions could be asked only if related to the purpose of the stop or based upon articulable suspicion. Because the facts in Childs suggested that the question about drugs was not related to the purpose of the stop (which was for a cracked windshield) nor (as the panel initially concluded) justified by reasonable suspicion of drug possession, the panel had to reach a holding that was broader than the holding in Rivera. Finally, the majority commits its own logical error by, in effect, arguing that "scope" is merely a proxy for duration. At least the panel incorporated Rivera's approach to analyzing what questions could be asked during a traffic stop, while the majority renders Rivera's approach moot.

The majority further opines that the panel opinion conflicts with certain decisions in this circuit that ostensibly approve of questioning about subjects as to which there is no suspicion. See United States v. Williams, 209 F.3d 940 (7th Cir. 2000); United States v. Baker, 78 F.3d 1241 (7th Cir. 1996). However, in neither of those cases did this court address the issue of whether questioning outside the scope of a traffic stop is a Fourth Amendment violation. Further, even though the issue was not briefed, there appears to have been articulable suspicion to justify the questions. In Williams, the police officer asked the defendant if he had anything on him that he shouldn't. 209 F.3d at 942. But the officer had been informed by a fellow officer that the passenger in the car had recently been the victim of a shooting and was known to carry weapons. Id. at 941. That information combined with the officer's observations would probably have been sufficient to raise articulable suspicion of a weapons offense. Likewise, in Baker, the officer asked if there were any drugs or weapons in the car. 78 F.3d at 1244. This question was asked only after the officer received inconsistent

and suspicious answers to permissible questions about where Baker was going that night. Id. at 1244. The suspicious and inconsistent answers together with the officer's observations and knowledge about the area would likely support an articulable suspicion of drug activity.

The majority attempts unsuccessfully to deal with the eminently sensible observation in Holt that "a typical traf fic stop resembles in character the investigative stop governed by Terry more closely than it does a custodial arrest." 264 F.3d at 1230. Based on its belief that Officer Chiola had probable cause (as opposed to reasonable suspicion) to stop the car for a presumed cracked windshield or seat belt violation, the majority concludes that the restrictions of Terry no longer apply. (Of course as to marijuana possession, Officer Chiola had only, at best, reasonable suspicion.) One problem with the probable cause analysis is that Childs was not the driver, so it is highly dubious that he could be placed under custodial arrest for the condition of the windshield. Even with respect to the seat belt violation, although Officer Chiola might have constitutionally taken Childs to the station house for booking, he did not do so. What he did (and facts should be controlling here) in the language of Holt, "resemble[d] in character the investigative stop governed by Terry more closely than it [did] a custodial arrest." What the majority seems to be saying is that, because Officer Chiola could have gone on to a custodial arrest, he may instead (and without subjecting Childs to custodial arrest) elect to inquire into crimes for which there is neither probable cause nor reasonablesuspicion. Under the factual circumstances that actually exist here, the restrictions of Terry ought reasonably to apply even though in theory this might be changed by proceeding to a custodial arrest with its particular legal regime.

This conclusion is fortified by the fact that this circuit has applied the Terry standard to cases in which the officer had probable cause to arrest the defendant for a traffic violation. See, e.g., United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999) (applying Terry where officer pulled vehicle over for

following other cars too closely); Valance v. Wisel, 110 F.3d 1269, 1276 (7th Cir. 1997) (applying Terry where officer pulled over vehicle for crossing center line twice); Finke, 85 F.3d at 1278-79 (applying Terry where officer pulled a vehicle over for speeding). Even the Fifth Circuit's ruling in Shabazz, on which the majority relies, applied the Terry standard in reaching its conclusion that the duration of the stop is the only Fourth Amendment limitation on traffic stops. See 993 F.2d at 434-35.

The footnote in Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984), besides being dictum, sheds little light on the present problem because the footnote appears in the context of a discussion whether Miranda warnings need to be administered to a detainee at a traffic stop. The Court concluded that Miranda warnings are not required because of the "nonthreatening" character of traffic stops. None of this suggests the possibility of interrogation on subjects other than the one for which the stop was made. In Berkemer, the defendant was stopped for suspicion of drunken driving and was asked questions about drinking alcohol and using marijuana (mentioned in response to earlier questions about intoxicants). In no way do these questions exceed the scope of the stop for drinking while intoxicated. The appearance of the word "scope" in the footnote therefore has no reference to interrogations about crimes outside the purpose of the stop.

The majority's reliance on Ohio v. Robinette, 519 U.S. 33 (1996), is also misplaced. In support of its elimination of the scope requirement from traffic stops, the majority says "[b]y rejecting the position of the state court in Robinette, the Supreme Court necessarily rejected the broader contention that unrelated questions may not be asked." Slip Opinion, at 10. This is not a logical, let alone a necessary, conclusion from Robinette. In Robinette, a police officer had stopped the defendant for speeding. 519 U.S. at 35. After issuing a verbal warning and returning Robinette's license, the officer asked Robinette whether he was "carrying any illegal contraband" in his car. Id. at 35-36. Robinette answered no, but he consented to have his car

searched. Id. Drugs were found, and Robinette was convicted for possession of a controlled substance. Id. The Supreme Court of Ohio overturned the conviction, and the United States Supreme Court reversed. Id. The Supreme Court of Ohio held that the police questioning was unconstitutional because it concerned matters unrelated to the purposes of the stop. However, in addition, the Supreme Court of Ohio established a bright-line rule for consensual interrogation under these circumstances. Id. It required the police officer to advise the driver that he was free to leave before such questions could be asked. Id. The United States Supreme Court reversed, holding that the police officer did not have to advise the driver of his freedom to leave in order for the encounter to become a consensual encounter. Id. at 421. However, both courts were proceeding on the assumption that the encounter was consensual once the traffic citation had been issued, but the Ohio court sought to formalize this transition by requiring the police officer to advise the driver that he was free to leave. By contrast, in the case before us, the encounter had not become consensual because the questions were asked during the processing of the traffic offense, not after the ticket had been issued. Robinette never addressed, let alone approved, questions asked during a routine traffic stop that do not concern the purpose of the stop or were not based upon reasonable suspicion. In Robinette, the stop had ended once the license was returned.

In attempting to equate questioning without detention with questioning in the course of detention, the majority conveniently ignores the fact that detention involves official coercion and therefore concerns quite a differentrelationship of the police officer to the person questioned. Anyone who has been pulled over for a traffic offense faces the police officer as one currently exercising authority over the motorist to keep him or her in place. This exercise of official coercion is the reason the Supreme Court has limited questioning to matters within the scope of the stop. The majority does not explain why exceeding the scope of the stop is somehow less burdensome to the detainee's Fourth Amendment rights than

exceeding a reasonable duration for the stop. To explore bank robberies or polygamy, as to which there is no reasonable suspicion, with Childs would be to abuse the rationale for the stop based on other matters and would be just as abusive as extending a ten-minute stop to an hour.

The majority comments blithely that the detainee can refuse to answer the questions posed by the police officer. How many times have you refused to answer questions asked by a police officer who has pulled your car over for a traffic offense? On the other hand, in a conversation between passengers seated on an airplane, where neither is exercising authority over the other, there would be nothing unusual about changing the subject if an embarrassing question were asked. There is simply all the difference in the world in the nature of the relationship between a police officer detaining someone for questioning and a police officer striking up a conversation on the bus. If the questions strayed far afield, one situation would present an invasion of privacy and the other would not.

The majority has sought to equate physical constraint (as of passengers in a bus or plane) with legal constraint (as of a passenger in an automobile stopped for a windshield violation). But the Fourth Amendment places limits only on the exercise of official authority which restrains movement or invades privacy. Physical obstacles to movement or escape, on the other hand implicate no constitutional right. As I have pointed out, however, an airline passenger can deal more light-heartedly with a seatmate than can a motorist pulled over for speeding. In any event, I should think we would want to avoid providing any incentives to the police to lure suspicious characters onto airplanes where they can perform acts of terrorism as well as be free to answer questions.

Based on the assumption that Officer Chiola had grounds for articulable suspicion of a marijuana violation by Childs because of their earlier encounter and Childs's changed demeanor, the conviction may be affirmed. Officer Chiola could not ask any question that came to mind even though unsupported by

reasonable suspicion. This broader rationale is not only incorrect but is unnecessary to the decision.

ROVNER, Circuit Judge, with whom DIANE P. WOOD and WILLIAMS, Circuit Judges, join, dissenting.  Like Judge Cudahy, I believe that the Fourth Amendment limits the scope as well as the duration of a traffic stop, so that it was improper for Officer Chiola to ask Childs whether he had any drugs on his person unless the officer had a reasonable, articulable basis for believing that he might. To that extent, I join Judge Cudahy's concurrence.

Unlike my colleague, however, I do not believe that Officer Chiola had the requisite reasonable suspicion that would have enabled him to ask Childs about narcotics. Only three circumstances suggested to Chiola that Childs might be up to something illegal: (1) marijuana had been discovered in Childs' possession three days earlier, when Chiola arrested him; (2) Childs appeared nervous to Chiola; and (3) during the prior encounter, Childs had not seemed nervous to Chiola. These facts certainly supported a hunch that Childs might again have marijuana in his possession, and as it turned out, Chiola's intuition was dead-on accurate. But even an inspired hunch will not justify an investigatory detention--or here, expanding the scope of a traffic stop beyond its original purpose. See United States v. Feliciano, 45 F.3d 1070, 1072 (7th Cir.), cert. denied, 516 U.S. 853, 116 S. Ct. 153 (1995). Rather, the articulable facts must support an objectively reasonable suspicion that the individual whom the officer wishes to question has just committed, is committing, or is about to commit a crime. See Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1879-80 (1968).

Although an individual's prior criminal acts and nervous demeanor are certainly factors that may contribute to reasonable suspicion, they do not alone establish such suspicion. A history of committing a particular type of crime no doubt suggests a willingness and ability to commit that act and perhaps--for

investigatory if not evidentiary purposes (see Fed. R. Evid. 404(b))--a predisposition to do so again. Feliciano, 45 F.3d at 1074. But without additional facts suggesting that a crime actually has been, or is about to be committed, a criminal record alone cannot justify detaining an individual for questioning. United States v. Jerez, 108 F.3d 684, 693 (7th Cir. 1997).

If the law were otherwise, any person with any sort of criminal record--or even worse, a person with arrests but no convictions--could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake. . . .

United States v. Sandoval, 29 F.3d 537, 543 (10th Cir. 1994) (emphasis in original). A nervous demeanor arguably is more telling than one's criminal history of what he is up to at present. Cf. Illinois v. Wardlow, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000). But because many law-abiding persons are anxious and fidgety when stopped by the police, see United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998), apparent nervousness likewise does not, without more, give rise to a reasonable suspicion that a crime may be in progress. E.g., United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999); see also United States v. Chavez-Valenzuela, 268 F.3d 719, 725-26 (9th Cir. 2001). Together, these circumstances--a previous crime and a present nervousness--can color the interpretation of the other facts confronting an officer; but without more they do not reasonably suggest that someone is involved in criminal activity. Compare United States v. McRae, 81 F.3d 1528, 1535-36 (10th Cir. 1996) (defendant's criminal record and unusually intense demeanor while watching officer, coupled with answers to questions concerning the return of his rental car that were vague and inconsistent with rental agreement itself, supported reasonable suspicion), with United States v. Sprinkle, 106 F.3d 613, 617-18 (4th Cir. 1997) (defendant's

criminal history and evasive behavior--raising his hand to hide his face as if to conceal identity from passing police officers and immediately driving away--did not give rise to reasonable suspicion, even when coupled with presence in neighborhood known for narcotics trafficking and officers' observation of him huddled with another individual toward center console of car with their hands close together), and United States v. Davis, 94 F.3d 1465, 1469-70 (10th Cir. 1996) (defendant's criminal history and evasive attitude--walking away from police, dropping eye contact, and keeping hands in pockets--did not, even when coupled with presence in high-crime neighborhood, give rise toreasonable suspicion).

   Like Officer Chiola, Judge Cudahy finds it noteworthy that in contrast to Childs' calm demeanor on the occasion of his prior arrest, he was visibly nervous when confronted by Chiola for the second time. Some of the cases addressing nervousness note that unless an officer knows how an individual normally acts when confronted by the police, his anxiety on a given occasion is not particularly probative because, as already noted, it would not be unusual for a law-abiding citizen to display anxiety when stopped and questioned by a law enforcement official. See Chavez-Valenzuela, 268 F.3d at 725, quoting Salzano, 158 F.3d at 1113; United States v. Bloom, 975 F.2d 1447, 1458 (10th Cir. 1992), overruled in part on other grounds by United States v. Little, 18 F.3d 1499 (10th Cir. 1994) (en banc). Thus the significance of Childs' change in demeanor: having been cool as a cucumber during his first encounter with Chiola, the thinking goes, Childs would not have been nervous on the subsequent encounter unless he had something to hide.

   But I think it is overstating the relevance of Childs' newfound apprehension to say that it was enough to make the difference between a mere hunch and a reasonable suspicion that Childs might have drugs on his person. Chiola's previous encounter with Childs had, after all, culminated in an arrest. It does not strike me at all unusual or suspicious that an individual arrested by a policeman only three days earlier would be demonstrably uncomfortable when again stopped and questioned by that officer.

The arrest alone--irrespective of the reason for it or what transpired during that arrest--arguably would account for one's nervousness when confronted on a later occasion by the same officer.

Other than the prior discovery of marijuana in Childs' possession and the dissipation of his sangfroid, Chiola was confronted with no other circumstance that pointed to criminal activity. No furtive gestures had been observed; he had not been seen transacting business with a known drug dealer; his appearance did not suggest recent drug use. See Sprinkle, 106 F.3d at 617; Davis, 94 F.3d at 1470. Such facts, coupled with his previous arrest and his nervous demeanor, might have supplied an objective basis on which to believe that he was carrying drugs once again. As it was, Officer Chiola had nothing more than a hunch that Childs might be hiding drugs; and that was not enough to permit him to expand the scope of the traffic stop by asking Childs whether he had any drugs in his possession.

To say that these very limited circumstances permitted Officer Chiola to expand the scope of the traffic stop and to question him about narcotics activity would, I fear, accord lesser Fourth Amendment protection to those with criminal records. See Sandoval, 29 F.3d at 543. Many people who have been arrested and/or who have spent time in jail will naturally be skittish when stopped and questioned by the police on subsequent occasions, even if they are doing nothing wrong. The Fourth Amendment demands that an investigatory detention be supported by facts that objectively point to current criminal activity. A recent arrest and a nervous demeanor fall well short of that showing.

I respectfully dissent.