Justice KENNEDY, dissenting.
My join in Justice THOMAS' dissenting opinion does not extend to Part III. Although the issue discussed in that Part was argued here, the Court of Appeals has not addressed that aspect of the case in any detail. In my view the better course would be to allow that court to do so in the first instance.
Justice THOMAS, with whom Justice ALITOjoins, and with whom Justice KENNEDYjoins as to all but Part III, dissenting.
Ten years ago, we explained that "conducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner."Illinois v. Caballes,543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). The only question here is whether an officer executed a stop in a reasonable manner when he waited to conduct a dog sniff until after he had given the driver a written warning and a backup unit had arrived, bringing the overall duration of the stop to 29 minutes. Because the stop was reasonably executed, no Fourth Amendment violation occurred. The Court's holding to the contrary cannot be reconciled with our decision in Caballesor a number of common police practices. It was also unnecessary, as the officer possessed reasonable suspicion to continue to hold the driver to conduct the dog sniff. I respectfully dissent.
I
The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amdt. 4. As the text indicates, and as we have repeatedly confirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.' " Brigham City v. Stuart,547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). We have defined reasonableness "in objective terms by examining the totality of the circumstances," Ohio v. Robinette,519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), and by considering "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing," Atwater v. Lago Vista,532 U.S. 318, 326, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001)(internal quotation marks omitted). When traditional protections have not provided a definitive answer, our precedents have "analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Virginia v. Moore,553 U.S. 164, 171, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008)(internal quotation marks omitted).
Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]," such a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States,517 U.S. 806, 809-810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests *1618 protected by the Constitution." Caballes, supra,at 407, 125 S.Ct. 834.
Because Rodriguez does not dispute that Officer Struble had probable cause to stop him, the only question is whether the stop was otherwise executed in a reasonable manner. See Brief for Appellant in No. 13-1176 (CA8), p. 4, n. 2. I easily conclude that it was. Approximately 29 minutes passed from the time Officer Struble stopped Rodriguez until his narcotics-detection dog alerted to the presence of drugs. That amount of time is hardly out of the ordinary for a traffic stop by a single officer of a vehicle containing multiple occupants even when no dog sniff is involved. See, e.g., United States v. Ellis,497 F.3d 606 (C.A.6 2007)(22 minutes); United States v. Barragan,379 F.3d 524 (C.A.8 2004)(approximately 30 minutes). During that time, Officer Struble conducted the ordinary activities of a traffic stop-he approached the vehicle, questioned Rodriguez about the observed violation, asked Pollman about their travel plans, ran serial warrant checks on Rodriguez and Pollman, and issued a written warning to Rodriguez. And when he decided to conduct a dog sniff, he took the precaution of calling for backup out of concern for his safety. See 741 F.3d 905, 907 (C.A.8 2014); see also Pennsylvania v. Mimms,434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(per curiam) (officer safety is a "legitimate and weighty" concern relevant to reasonableness).
As Caballesmakes clear, the fact that Officer Struble waited until after he gave Rodriguez the warning to conduct the dog sniff does not alter this analysis. Because "the use of a well-trained narcotics-detection dog ... generally does not implicate legitimate privacy interests," 543 U.S., at 409, 125 S.Ct. 834"conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," id.,at 408, 125 S.Ct. 834. The stop here was "lawful at its inception and otherwise executed in a reasonable manner." Ibid. As in Caballes,"conducting a dog sniff [did] not change the character of [the] traffic stop," ibid.,and thus no Fourth Amendment violation occurred.
II
Rather than adhere to the reasonableness requirement that we have repeatedly characterized as the "touchstone of the Fourth Amendment," Brigham City, supra,at 403, 126 S.Ct. 1943the majority constructed a test of its own that is inconsistent with our precedents.
A
The majority's rule requires a traffic stop to "en[d] when tasks tied to the traffic infraction are-or reasonably should have been-completed." Ante,at 1614. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission" and he may hold the individual no longer. Ante,at 1616 (internal quotation marks and alterations omitted). The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.
I "cannot accept that the search and seizure protections of the Fourth Amendment *1619 are so variable and can be made to turn upon such trivialities." Whren,517 U.S., at 815, 116 S.Ct. 1769(citations omitted). We have repeatedly explained that the reasonableness inquiry must not hinge on the characteristics of the individual officer conducting the seizure. We have held, for example, that an officer's state of mind "does not invalidate [an] action taken as long as the circumstances, viewed objectively, justify that action." Id.,at 813, 116 S.Ct. 1769(internal quotation marks omitted). We have spurned theories that would make the Fourth Amendment "change with local law enforcement practices." Moore, supra,at 172, 128 S.Ct. 1598. And we have rejected a rule that would require the offense establishing probable cause to be "closely related to" the offense identified by the arresting officer, as such a rule would make "the constitutionality of an arrest ... vary from place to place and from time to time, depending on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists."Devenpeck v. Alford,543 U.S. 146, 154, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)(internal quotation marks and citation omitted). In Devenpeck,a unanimous Court explained: "An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie in precisely the same circumstanceswould not. We see no reason to ascribe to the Fourth Amendment such arbitrarily variable protection." Ibid.
The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer in precisely the same circumstancesmight not, if in fact his knowledge and experience made him capable of completing the stop faster. We have long rejected interpretations of the Fourth Amendment that would produce such haphazard results, and I see no reason to depart from our consistent practice today.
B
As if that were not enough, the majority also limits the duration of the stop to the time it takes the officer to complete a narrow category of "traffic-based inquiries." Ante, at 1616. According to the majority, these inquiries include those that "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Ante,at 1615. Inquiries directed to "detecting evidence of ordinary criminal wrongdoing" are not traffic-related inquiries and thus cannot count toward the overall duration of the stop. Ibid. (internal quotation marks and alteration omitted).
The combination of that definition of traffic-related inquiries with the majority's officer-specific durational limit produces a result demonstrably at odds with our decision in Caballes. Caballesexpressly anticipated that a traffic stop could be reasonablyprolonged for officers to engage in a dog sniff. We explained that no Fourth Amendment violation had occurred in Caballes,where the "duration of the stop ... was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," but suggested a different result might attend a case "involving a dog sniff that occurred during an unreasonablyprolonged traffic stop." 543 U.S., at 407-408, 125 S.Ct. 834(emphasis added). The dividing line was whether the overall duration of the stop exceeded "the time reasonably required to complete th[e] mission," id.,at 407, 125 S.Ct. 834not, as the majority suggests, whether the duration of the stop "in fact" exceeded the time necessary *1620 to complete the traffic-related inquiries, ante,at 1616.
The majority's approach draws an artificial line between dog sniffs and other common police practices. The lower courts have routinely confirmed that warrant checks are a constitutionally permissible part of a traffic stop, see, e.g., United States v. Simmons,172 F.3d 775, 778 (C.A.11 1999); United States v. Mendez,118 F.3d 1426, 1429 (C.A.10 1997); United States v. Shabazz,993 F.2d 431, 437 (C.A.5 1993), and the majority confirms that it finds no fault in these measures, ante,at 1615. Yet its reasoning suggests the opposite. Such warrant checks look more like they are directed to "detecting evidence of ordinary criminal wrongdoing" than to "ensuring that vehicles on the road are operated safely and responsibly." Ante,at 1615 (internal quotation marks and alteration omitted). Perhaps one could argue that the existence of an outstanding warrant might make a driver less likely to operate his vehicle safely and responsibly on the road, but the same could be said about a driver in possession of contraband. A driver confronted by the police in either case might try to flee or become violent toward the officer. But under the majority's analysis, a dog sniff, which is directed at uncovering that problem, is not treated as a traffic-based inquiry. Warrant checks, arguably, should fare no better. The majority suggests that a warrant check is an ordinary inquiry incident to a traffic stop because it can be used " 'to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.' " Ante, at 1615 (quoting 4 W. LaFave, Search and Seizure § 9.3(c), p. 516 (5th ed. 2012)). But as the very treatise on which the majority relies notes, such checks are a "manifest[ation of] the 'war on drugs' motivation so often underlying [routine traffic] stops," and thus are very much like the dog sniff in this case. Id.,§ 9.3(c), at 507-508.
Investigative questioning rests on the same basis as the dog sniff. "Asking questions is an essential part of police investigations." Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.,542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). And the lower courts have routinely upheld such questioning during routine traffic stops. See, e.g.,United States v. Rivera,570 F.3d 1009, 1013 (C.A.8 2009); United States v. Childs,277 F.3d 947, 953-954 (C.A.7 2002). The majority's reasoning appears to allow officers to engage in some questioning aimed at detecting evidence of ordinary criminal wrongdoing. Ante,at 1614. But it is hard to see how such inquiries fall within the "seizure's 'mission' [of] address[ing] the traffic violation that warranted the stop," or "attend[ing] to related safety concerns." Ibid.Its reasoning appears to come down to the principle that dogs are different.
C
On a more fundamental level, the majority's inquiry elides the distinction between traffic stops based on probable cause and those based on reasonable suspicion. Probable cause is the"traditional justification" for the seizure of a person. Whren,517 U.S., at 817, 116 S.Ct. 1769(emphasis deleted); see also Dunaway v. New York,442 U.S. 200, 207-208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). This Court created an exception to that rule in Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), permitting "police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause," Michigan v. Summers,452 U.S. 692, 698, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Reasonable suspicion is the justification for such seizures. Prado Navarette v.
*1621 California,572 U.S. ----, ----, 134 S.Ct. 1683, 1687-1688, 188 L.Ed.2d 680 (2014).
Traffic stops can be initiated based on probable cause or reasonable suspicion. Although the Court has commented that a routine traffic stop is "more analogous to a so-called 'Terrystop' than to a formal arrest," it has rejected the notion "that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terrystop." Berkemer v. McCarty,468 U.S. 420, 439, and n. 29, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)(citation omitted).
Although all traffic stops must be executed reasonably, our precedents make clear that traffic stops justified by reasonable suspicion are subject to additional limitations that those justified by probable cause are not. A traffic stop based on reasonable suspicion, like all Terrystops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place."Hiibel, 542 U.S., at 185, 124 S.Ct. 2451(internal quotation marks omitted). It also "cannot continue for an excessive period of time or resemble a traditional arrest." Id.,at 185-186, 124 S.Ct. 2451(citation omitted). By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, Atwater,532 U.S., at 354, 121 S.Ct. 1536a warrantless search incident to arrest of the driver, Riley v. California,573 U.S. ----, ----, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014), and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there, Arizona v. Gant,556 U.S. 332, 335, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).
The majority casually tosses this distinction aside. It asserts that the traffic stop in this case, which was undisputedly initiated on the basis of probable cause, can last no longer than is in fact necessary to effectuate the mission of the stop. Ante, at 1616. And, it assumes that the mission of the stop was merely to write a traffic ticket, rather than to consider making a custodial arrest. Ante, at 1614. In support of that durational requirement, it relies primarily on cases involving Terrystops. See ante,at 1614 - 1615 (citing Arizona v. Johnson,555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)(analyzing "stop and frisk" of passenger in a vehicle temporarily seized for a traffic violation); United States v. Sharpe,470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)(analyzing seizure of individuals based on suspicion of marijuana trafficking); Florida v. Royer,460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)(plurality opinion) (analyzing seizure of man walking through airport on suspicion of narcotics activity)).
The only case involving a traffic stop based on probable cause that the majority cites for its rule is Caballes. But, that decision provides no support for today's restructuring of our Fourth Amendment jurisprudence. In Caballes,the Court made clear that, in the context of a traffic stop supported by probable cause, "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." 543 U.S., at 408, 125 S.Ct. 834. To be sure, the dissentin Caballeswould have "appl[ied] Terry's reasonable-relation test ... to determine whether the canine sniff impermissibly expanded the scope of the initially valid seizure of Caballes." Id.,at 420, 125 S.Ct. 834(GINSBURG, J., dissenting). But even it conceded that the Caballesmajority had "implicitly [rejected] the application of Terryto a traffic stop converted, by calling *1622 in a dog, to a drug search." Id.,at 421, 125 S.Ct. 834.
By strictly limiting the tasks that define the durational scope of the traffic stop, the majority accomplishes today what the Caballesdissent could not: strictly limiting the scope of an officer's activities during a traffic stop justified by probable cause. In doing so, it renders the difference between probable cause and reasonable suspicion virtually meaningless in this context. That shift is supported neither by the Fourth Amendment nor by our precedents interpreting it. And, it results in a constitutional framework that lacks predictability. Had Officer Struble arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the Fourth Amendment. See Atwater, supra, at 354-355, 121 S.Ct. 1536. But because he made Rodriguez wait for seven or eight extra minutes until a dog arrived, he evidently committed a constitutional violation. Such a view of the Fourth Amendment makes little sense.
III
Today's revision of our Fourth Amendment jurisprudence was also entirely unnecessary. Rodriguez suffered no Fourth Amendment violation here for an entirely independent reason: Officer Struble had reasonable suspicion to continue to hold him for investigative purposes. Our precedents make clear that the Fourth Amendment permits an officer to conduct an investigative traffic stop when that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Prado Navarette, 572 U.S., at ----, 134 S.Ct., at 1687(internal quotation marks omitted). Reasonable suspicion is determined by looking at "the whole picture," ibid.,taking into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Ornelas v. United States,517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)(internal quotation marks omitted).
Officer Struble testified that he first became suspicious that Rodriguez was engaged in criminal activity for a number of reasons. When he approached the vehicle, he smelled an "overwhelming odor of air freshener coming from the vehicle," which is, in his experience, "a common attempt to conceal an odor that [people] don't want ... to be smelled by the police." App. 20-21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was "more nervous than your typical passenger" who "do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation." Id.,at 34.
Officer Struble's interactions with the vehicle's occupants only increased his suspicions. When he asked Rodriguez why he had driven onto the shoulder, Rodriguez claimed that he swerved to avoid a pothole. But that story could not be squared with Officer Struble's observation of the vehicle slowly driving off the road before being jerked back onto it. And when Officer Struble asked Pollman where they were coming from and where they were going, Pollman told him they were traveling from Omaha, Nebraska, back to Norfolk, Nebraska, after looking at a vehicle they were considering purchasing. Pollman told the officer that he had neither seen pictures of the vehicle nor confirmed title before the trip. As Officer Struble explained, it "seemed suspicious" to him "to drive ... approximately two hours ... late at night to see a vehicle *1623 sight unseen to possibly buy it," id.,at 26, and to go from Norfolk to Omaha to look at it because "[u]sually people leave Omaha to go get vehicles, not the other way around" due to higher Omaha taxes, id.,at 65.
These facts, taken together, easily meet our standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," Illinois v. Wardlow,528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and both vehicle occupants were engaged in such conduct. The officer also recognized heavy use of air freshener, which, in his experience, indicated the presence of contraband in the vehicle. "[C]ommonsense judgments and inferences about human behavior" further support the officer's conclusion that Pollman's story about their trip was likely a cover story for illegal activity. Id.,at 125, 120 S.Ct. 673. Taking into account all the relevant facts, Officer Struble possessed reasonable suspicion of criminal activity to conduct the dog sniff.
Rodriguez contends that reasonable suspicion cannot exist because each of the actions giving rise to the officer's suspicions could be entirely innocent, but our cases easily dispose of that argument. Acts that, by themselves, might be innocent can, when taken together, give rise to reasonable suspicion. United States v. Arvizu,534 U.S. 266, 274-275, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Terryis a classic example, as it involved two individuals repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man. 392 U.S., at 6, 88 S.Ct. 1868. The Court reasoned that this "series of acts, each of them perhaps innocent in itself, ... together warranted further investigation," id.,at 22, 88 S.Ct. 1868and it has reiterated that analysis in a number of cases, see, e.g., Arvizu, supra,at 277, 122 S.Ct. 744; United States v. Sokolow,490 U.S. 1, 9-10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). This one is no different.
* * *
I would conclude that the police did not violate the Fourth Amendment here. Officer Struble possessed probable cause to stop Rodriguez for driving on the shoulder, and he executed the subsequent stop in a reasonable manner. Our decision in Caballesrequires no more. The majority's holding to the contrary is irreconcilable with Caballesand a number of other routine police practices, distorts the distinction between traffic stops justified by probable cause and those justified by reasonable suspicion, and abandons reasonableness as the touchstone of the Fourth Amendment. I respectfully dissent.