In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2094

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE MCBRIDE, a/k/a WILLIAM REO DAVIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:09-CR-21-TLS—**Theresa L. Springmann**, *Judge.*

ARGUED NOVEMBER 10, 2010—DECIDED MARCH 14, 2011

Before CUDAHY, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Following a routine traffic stop, a consent search of Willie McBride's car turned up crack cocaine, marijuana, and a loaded handgun. An indictment followed, and McBride was charged with possession of controlled substances with intent to distribute, 21 U.S.C. § 841(a)(1), and possession of a firearm during and in relation to a drug-trafficking crime, 18 U.S.C. § 924(c). McBride moved to suppress the evi-

dence recovered from his car on the ground that the officer who performed the search obtained his consent only after unreasonably prolonging the traffic stop. The district court conducted an evidentiary hearing and denied the motion. McBride then pleaded guilty to both counts, reserving the right to challenge the suppression ruling on appeal, and the court sentenced him to consecutive 60-month terms. The only question presented by this appeal is whether the police officer violated McBride's rights under the Fourth Amendment—thus vitiating his consent to search—by detaining him beyond the time needed to complete the traffic stop. We conclude that he did not and affirm the judgment.

## I. Background

At the hearing on McBride's suppression motion, Officer James Gasvoda of the Allen County Sheriff's Department recounted the details of the traffic stop that led to McBride's arrest. Gasvoda testified that on February 2, 2009, he stopped McBride and a passenger heading westbound out of Fort Wayne, Indiana. McBride was missing the rear license plate on his Chevrolet Monte Carlo and was speeding and changing lanes without signaling. Gasvoda initiated a traffic stop, a recording of which was taped by a squad-car camera and admitted into evidence.

Some 25 minutes elapsed from the time McBride was stopped until he consented to the vehicle search. The stop began routinely enough; Gasvoda approached and

asked McBride for his license, registration, and proof of insurance. He also asked McBride's passenger for identification. McBride provided an Illinois identification card and proof of insurance but no license, while his passenger had nothing in the way of identification. Gasvoda noticed that both McBride and his passenger were avoiding eye contact and appeared nervous, their hands shaking and "carotid arteries . . . pulsing."

Approximately four minutes into the stop, Gasvoda asked McBride to step out of the Monte Carlo and stand in front of the squad car. Gasvoda testified that this was a routine safety measure. When McBride got out, Gasvoda obtained his permission to conduct a pat-down search, which turned up nothing, though Gasvoda testified that McBride remained "overly nervous" throughout. Gasvoda explained the reasons for the stop and asked McBride basic questions about his driving status. McBride admitted that he was driving on an expired license. Gasvoda then asked several questions about McBride's and his passenger's travel plans: Where were they coming from and how long had they been there, where were they going, and did they have any luggage? McBride identified his passenger as his cousin and said they were returning to Chicago from Fort Wayne, where for the past three weeks they had been visiting relatives. He also said he had a bag of laundry in the trunk. This line of questioning lasted less than one minute. During the exchange, a second officer arrived with a dog to conduct a canine sniff of the vehicle, which was negative.

While McBride waited near the squad car, Gasvoda returned to the Monte Carlo and spoke with the passenger.

After explaining why he had stopped the car, Gasvoda asked the passenger similar questions about the trip. The passenger said they had visited his sister in Fort Wayne for two days but brought no luggage. This exchange lasted over a minute. Before returning to the squad car to run the vehicle information, Gasvoda briefly followed up with McBride about the trip to Fort Wayne. This time McBride said they had stayed for two weeks and were visiting his cousin's mother. Before returning to his squad car, Gasvoda offered to retrieve McBride's coat from the Monte Carlo. McBride, who had been standing in the cold since the stop began, accepted this offer. Another minute or so passed while Gasvoda fetched the coat, and with McBride's consent, searched the pockets. Gasvoda then spent the next ten minutes in his squad car calling in the license and vehicle information and writing a ticket. When he finished, he handed McBride a speeding ticket and explained his payment responsibilities.

It was then that the traffic stop took an unexpected turn. Gasvoda asked McBride whether he had "any dead bodies or anything" in his car. McBride, laughing, replied, "No, would you like to search?" Gasvoda said that he would, and again asked, this time more directly, for consent to search. McBride consented, and the search turned up the gun and a drink can containing crack cocaine and marijuana.

The district court concluded that the seizure did not violate the Fourth Amendment. The court found that

Gasvoda had spent the better part of the stop controlling the scene and gathering information about the Monte Carlo, McBride, and his passenger. The few additional questions, the court observed, were negligible when considered in relation to the entire stop and thus did not unreasonably extend the duration of the detention.

## II. Discussion

The argument McBride makes on appeal is basic enough: He contends that Gasvoda detained him beyond the time necessary to issue a traffic citation. He does not dispute that Gasvoda had probable cause to stop his car, or that he voluntarily consented to both the pat-down search and the vehicle search that ultimately led to his arrest. Rather, he argues that by the time he consented to the vehicle search, the stop had already been unreasonably drawn out with investigatory questions unrelated to the purpose of the traffic violations.

A detention following a traffic stop, like any seizure, must satisfy the Fourth Amendment's requirement of reasonableness. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010). In *United States v. Childs*, 277 F.3d 947, 952-53 (7th Cir. 2002) (en banc), we distinguished stops based on probable cause from those based on reasonable suspicion, holding that the former are fundamentally different and not subject to the scope and duration limitations of *Terry v. Ohio*, 392 U.S. 1, 20 (1968). This important distinction is implicated here. Because a stop based on

probable cause will also justify a custodial arrest, a driver detained during such a stop has no right to expeditious release. As we explained in *Childs*, "arrested persons (unlike those stopped at checkpoints, or on reasonable suspicion) need *not* be released as quickly as possible." 277 F.3d at 952; *see also Ray v. City of Chicago*, 629 F.3d 660, 663 (7th Cir. 2011); *United States v. Moore*, 375 F.3d 580, 583 (7th Cir. 2004). Further questioning is permitted and will not render the stop unreasonable so long as the officer asks "[q]uestions that hold potential for detecting crime, yet create little or no inconvenience." *Childs*, 277 F.3d at 954.

Our decision in *Childs* forecloses a challenge to the reasonableness of this traffic stop. Gasvoda had a grace period following the completion of the stop during which he could ask investigatory questions provided they did not cause "inconvenience." *Id.* The additional questioning here did not amount to an inconvenience, adding only minutes to the stop. *Id*. Moreover, Gasvoda had reasonable grounds, independent of the traffic violations, to believe that his questions held the potential for detecting crime. *See Estrada v. Rhode Island*, 594 F.3d 56, 64 (1st Cir. 2010) (recognizing that information gathered during traffic stop may provide reasonable suspicion of criminal conduct that will justify extending the stop); *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007); *United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004).

One of the first things Gasvoda noticed when he approached the Monte Carlo was that its occupants were

visibly nervous. And while the appearance of anxiety may not by itself form an objective basis for suspecting criminal activity, *see United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005), Gasvoda soon discovered that McBride and his passenger had conflicting stories about their trip to Fort Wayne, and that McBride, when questioned a second time, could not keep even his own story straight. Taken in combination, these developments gave rise to reasonable suspicion of criminal activity, and Gasvoda was justified in briefly extending the stop to investigate the suspicion. *See Figueroa-Espana*, 511 F.3d at 703 (extended stop justified by driver's nervous demeanor and conflicting statements); *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (driver aroused reasonable suspicion with inconsistent statements to officer); *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005); *see also Childs*, 277 F.3d at 954.

For completeness we note that McBride's challenge would fail under a traditional "scope and duration" analysis. In their content and duration, Gasvoda's questions are hard to distinguish from inquiries by officers under similar circumstances that we have upheld as reasonable. *See Taylor*, 596 F.3d at 376 (several unrelated questions about drugs did not unreasonably prolong traffic stop); *Muriel*, 418 F.3d at 725-26 (routine inquiry about travel plans did not unreasonably prolong traffic stop); *Childs*, 277 F.3d at 953 ("a minute or so" of extra questioning was not enough to make traffic stop unreasonable). Gasvoda spent most of the stop performing routine police work—securing the scene, gathering information about the Monte Carlo and its occupants,

relaying information to dispatch, and writing a ticket. The district court found that the additional questions extended the stop by "roughly two minutes" at most. This was not unreasonable and did not convert a lawful stop into an unlawful one.

AFFIRMED.