In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-2532 & 11-2877

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

OSCAR BUENO and
JOSE GONZALEZ-ZAVALA,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:09-cr-00546-6, -3—**William J. Hibbler**, *Judge*.

ARGUED SEPTEMBER 24, 2012—DECIDED JANUARY 7, 2013

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

BAUER, *Circuit Judge*. Oscar Bueno and Jose Gonzalez-Zavala belonged to a drug trafficking organization investigated by the Drug Enforcement Administration ("DEA"). Both pleaded guilty to conspiracy to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. § 846. Prior to entering his guilty plea, Bueno filed a motion to suppress evidence obtained following a

traffic stop, the denial of which he now appeals. Gonzalez-Zavala appeals his sentence, contending that the district court relied on clearly erroneous facts in determining his sentence and that the evidence was insufficient to sustain the application of enhancements under §§ 2D1.1(b)(12) and 2D1.1(b)(14)(E) of the United States Sentencing Guidelines. For the reasons that follow, we affirm the judgments of the district court.

## I.  BACKGROUND

Bueno and Gonzalez-Zavala were members of a Chicago-based distribution cell of the La Familia Michoacana drug trafficking organization (the "Organization") based in Mexico. The DEA conducted an investigation of the Organization from 2007 to 2009.

Gonzalez-Zavala worked for the Chicago cell from at least 2007 through 2009. From December 2008 through June 2009, Gonzalez-Zavala was a leader and supervisor of the cell and was responsible for overseeing the distribution of cocaine and the collection of drug proceeds in the Chicago area. This was not a small endeavor; the cell's drug trafficking activity generated proceeds exceeding $20 million for the Organization. Gonzalez-Zavala personally supervised the distribution of 420 kilograms of cocaine and the collection of over $5.7 million in drug proceeds. In order to facilitate the distribution of drugs and the collection of drug proceeds, Gonzalez-Zavala maintained several stash houses, including a house in Joliet, Illinois, where 54 kilograms of cocaine

were found on the day of his arrest, and a house in Plainfield, Illinois, where $1.3 million in cash drug proceeds were discovered.

The proceeds generated by the Chicago cell's cocaine distribution were returned to Mexico by the Organization's couriers, including Bueno and Ismael Flores. Approximately every two weeks, from November 2008 to April 2009, Bueno and Flores collected money from different wholesale cocaine distributors in the Chicago area, including Gonzalez-Zavala and his associates, and drove it to Texas. Between January and April 2009, Bueno and Flores picked up cash five times in amounts ranging from $450,000 to $900,000 from Gonzalez-Zavala's couriers. In total, Bueno was involved in transporting approximately $3 million in cash drug proceeds.

As part of the DEA's investigation into the Organization, agents intercepted conversations between Gonzalez-Zavala and Flores on April 14 and 15, 2009, and learned of plans to transport narcotics proceeds from Chicago to Mexico. Based on these calls, DEA agents conducted surveillance of one of Gonzalez-Zavala's stash houses, and subsequently observed the delivery of what they believed to be cash to Flores on April 15.

On April 16, agents observed Flores and Bueno loading boxes into a blue Chevrolet van owned by Flores. Later that night, Bueno and Flores were driving southbound on Interstate 57 in Douglas County, Illinois, in the blue Chevrolet van. Bueno was driving the van and Flores sat in the front passenger seat. At 9:56 p.m., Illinois State Trooper Chris Owen stopped the van after

observing it traveling 69 miles per hour in a 65 miles per hour zone.[1]

After curbing the van, Trooper Owen approached the passenger side of the van and spoke with Bueno and Flores. He informed them that the van had been speeding and asked for their identification and registration documents. Bueno provided a valid Texas driver's license, and Flores provided the van's registration and a Texas license. According to Trooper Owen, both Bueno and Flores appeared nervous during this exchange: their hands were trembling, and Flores appeared flustered as he searched the glove box of the van for the registration.

Trooper Owen noticed that the back of the van was full of boxes and commented that they were "loaded down." Flores responded that they were headed to Dallas. Trooper Owen inquired further, and Flores told Trooper Owen that he and Bueno lived in Dallas and that he owned a transportation company. He said that they were currently transporting packages to Mexico and gave Trooper Owen a business card bearing the name "Transportes Ocampo" and a Chicago address. Trooper Owen asked Flores if he had motor carrier or Department of Transportation authority, and Flores said that his accountant told him he did not need such authority for his business.

---

[1] What happened during the stop is largely undisputed as Trooper Owen's squad car camera recorded audio and video of the stop.

Trooper Owen next asked Bueno to exit the van, patted him down, and directed him to the front seat of his squad car. A dog was caged in the rear seating area of the car. As Trooper Owen ran Bueno's license for active warrants, he asked Bueno questions regarding the contents, loading, shipping bills, and transportation of the packages. Bueno said that he had been working for Flores for about twelve months, and that he was paid for transporting packages from Chicago to Dallas. He said that they were paid by the individuals who sent the packages, and agreed that the company was similar to FedEx. Bueno said that they were taking the packages to Texas, and that someone else would then transport them to Mexico. After confirming that Bueno had no outstanding warrants, Trooper Owen told him that he would issue him a written warning for speeding, and began preparing the written warning.

During this time, Trooper Owen continued to question Bueno about the transportation business. Bueno confirmed again that the business did not operate under any sort of authority similar to those under which many shipping companies operate. Trooper Owen also asked about the origins and contents of packages. Bueno said that they usually contained clothing and personal items like DVD players, and that "different people" dropped the boxes off, such as people sending items to family members in Mexico. He said that there were shipping bills or receipts for each box, which Flores maintained. Bueno said that he helped load the boxes in Chicago about every two weeks, and that he was only a driver for the company.

Trooper Owen then gave Bueno a copy of the written warning. At this point, about eleven minutes had passed since Trooper Owen initiated the stop. Trooper Owen again questioned Bueno about the packages, and asked Bueno if he was nervous. Trooper Owen told Bueno that he could "hear [his] heart beating in [his] voice." Bueno denied that he was nervous or had any reason to be nervous, but then agreed that being around police officers made him nervous. Trooper Owen next told Bueno that he was going to talk to Flores and "investigate a little further" about the packages they were transporting. He advised Bueno to remain in the vehicle, then asked if he would mind doing so; Bueno said "that's fine."

Trooper Owen returned to the van. He told Flores that he had only issued Bueno a written warning, and that they should be careful in the construction zone they were approaching on the highway. Trooper Owen next asked Flores for the "bills" for all the boxes and asked what the boxes contained. Flores said that the bills were in the back of the van, and that the boxes contained items such as clothing and shoes destined for Mexico. When Trooper Owen again requested the shipping papers for the packages, Flores exited the van and retrieved a plastic bag from the cargo area that contained small shipping papers and a large amount of cash. Flores said that the cash, which was later determined to total around $4,000, was the money they collected on the trip. Trooper Owen reviewed the shipping papers, but as they did not identify the contents of the packages, he asked if Flores knew what the boxes contained. Flores said that he checked the contents of some of

the boxes, but that others were not checked because they arrived as he and Bueno were leaving. He then denied responsibility for the contents of the packages.

Trooper Owen asked Flores for consent to search the van, and Flores gave him verbal permission. He also signed a written form confirming his consent. Trooper Owen retrieved the dog from the squad car to conduct a canine sniff of the van's exterior, and in less than a minute, the dog positively alerted for the odor of narcotics. At this point, the stop had lasted nineteen minutes, and about eight to nine minutes had passed since Trooper Owen gave Bueno the written warning and left him in the squad car. Following the dog's positive alert, Trooper Owen and other law enforcement officers who had arrived at the scene of the stop removed and opened boxes from the van. They found a box containing a large number of brick-shaped objects that were wrapped in plastic, and the dog gave another positive alert.[2] A subsequent search of the van recovered $2,694,000 from the boxes. Bueno and Flores were then handcuffed and brought to the police station, where both made inculpatory statements admitting that the currency they were transporting resulted from the sale of narcotics and that its ultimate destination was Mexico.

On January 13, 2011, Bueno and Gonzalez-Zavala were charged in a seventeen-count third superseding

---

[2] This is not evident in the video and is instead reported in Trooper Owen's report of the stop. Bueno, however, does not dispute this fact.

indictment along with several co-defendants. On February 10, 2011, Bueno filed a motion to suppress the physical evidence and statements the police obtained as a result of the stop of the van. He argued that the traffic stop conducted by Trooper Owen was unduly prolonged beyond the time reasonably required to conduct a traffic stop in violation of the Fourth Amendment. The district court denied Bueno's motion to suppress, finding that the stop was supported by probable cause based on Trooper Owen's observations during the stop as well as the collective knowledge of agents of the DEA. Bueno subsequently entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress, to count one of the third superseding indictment, conspiracy to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. § 846. He was sentenced to sixty-three months' imprisonment and three years of supervised release.

On March 8, 2011, Gonzalez-Zavala pleaded guilty to count one of the third superseding indictment without the benefit of a plea agreement. The presentence investigation report ("PSR") recommended a base offense level of 38 and three enhancements and one reduction: a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises to distribute a controlled substance; a two-level enhancement under U.S.S.G. § 2D1.1(b)(14)(E) for committing the offense as part of a pattern of criminal conduct engaged in as a livelihood; a four-level enhancement under U.S.S.G. § 3B1.1(a) for being a leader of a criminal activity that involved five or more participants; and a three-level

reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). Gonzalez-Zavala did not file any objections to the PSR.

At sentencing, after providing the parties an opportunity to correct or change the PSR—neither party opted to do so—the district court adopted its findings and recommended total base offense level of 43 and criminal history category of III. This resulted in a Guidelines range of life imprisonment. The Government requested a life sentence, while Gonzalez-Zavala argued that a 262-month sentence was appropriate. He contended that a below-Guidelines sentence was warranted because his legitimate employment opportunities were limited due to his third-grade education, he had traveled to the United States to assist his family in Mexico, and his fear of reprisals against his family constrained his ability to cooperate with the Government. In support, he submitted letters from his wife and daughter in Mexico. In her letter, Gonzalez-Zavala's wife described the family's dire financial situation and wrote, "We were doing okay when [Gonzalez-Zavala] lived with us but unfortunately he left my children and I." Gonzalez-Zavala's daughter similarly described her family's struggles and need for her father's financial support. The pictures of his family in Mexico included a picture of his daughter gathering wood for a fire used to heat the family home.

The district court discussed Gonzalez-Zavala's arguments in favor of a lower sentence, and ultimately rejected the Guidelines range of life imprisonment. Regarding the letters and pictures from Gonzalez-

Zavala's family, the district court acknowledged the family's circumstances, but expressed concern that the letters indicated that his family still suffered despite Gonzalez-Zavala's access to funds while he was directing the Chicago cell of the Organization. The district court also acknowledged Gonzalez-Zavala's argument regarding his failure to cooperate with the Government, but noted the central role Gonzalez-Zavala played in the Chicago cell. Ultimately, the district court sentenced Gonzalez-Zavala to 480 months' imprisonment.

## II.  DISCUSSION

As we have noted, Bueno challenges the denial of his motion to suppress, whereas Gonzalez-Zavala challenges his sentence. We consider each appeal in turn.

### A.  Bueno

Bueno contends that the district court erred in denying his motion to suppress because he was detained beyond the time reasonably required to conduct a traffic stop. When reviewing the denial of a motion to suppress, we review the district court's conclusions of law *de novo* and findings of fact for clear error. *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012).[3]

---

[3]  We note, as an initial matter, that the Government challenges Bueno's "standing to challenge the search of Flores' van"

(continued...)

The Fourth Amendment of the Constitution guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. When police officers stop an automobile and detain the occupants, even if

---

[3] (...continued)

because he failed to establish a subjective expectation of privacy in the van as Flores was the owner of the van. This argument misses the point: Bueno challenges the reasonableness of the prolongation of the stop—and the resulting seizure—not the search of the van. *See Brendlin v. California*, 551 U.S. 249, 253, 127 S.Ct. 2400, 2404, 168 L.Ed.2d 132 (2007) ("He did not assert that his Fourth Amendment rights were violated by the search of Simeroth's vehicle, *cf. Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), but claimed only that the traffic stop was an unlawful seizure of his person."). Regardless of whether Bueno had a possessory interest in the vehicle, he has standing to challenge the lawfulness of his detention. *See United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) ("Even though Green lacked a possessory or property interest in the motor vehicle that would enable him to directly challenge the search, he may still contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention." (citation omitted)); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) ("[A]lthough a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention.'" (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).

only for a brief period, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). A traffic stop must therefore satisfy the Fourth Amendment's requirement of reasonableness. *Id.* at 810. As a general matter, the decision to stop an automobile is reasonable when the police have probable cause to believe that a person has committed a traffic offense. *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010). Here, Trooper Owen stopped the van after observing it exceed the speed limit, and Bueno does not dispute this fact. Accordingly, the initial stop of the van and questioning of Bueno were proper.

Even a "seizure that is lawful at its inception," however, can "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (citation omitted). In the context of a traffic stop, this means that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Thus, while officers need not have reasonable suspicion to ask questions unrelated to the purpose of the traffic stop, "questions that prolong custody may affect the reasonableness of the detention." *United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005).

Relying on *Caballes*, Bueno argues that his continued detention after Trooper Owen issued the written warning ran afoul of the Fourth Amendment. As Bueno points

out, Trooper Owen gave Bueno the written warning
around eleven minutes into the stop, but he was
detained while Trooper Owen questioned Flores and
searched the van, and he was not placed in handcuffs
until thirty-nine minutes into the stop. Bueno argues
that his detention after Trooper Owen left him in the
squad car was unreasonable, and that all evidence
obtained as a result of this unlawful detention—namely,
the currency recovered from the van and Bueno's
inculpatory statements—must be suppressed.

Although Bueno challenges the entirety of the stop
after the issuance of the written warning, we view the
traffic stop as having three distinct phases. The first
phase began with Trooper Owen's initiation of the stop
and lasted through the issuance of the written warning.
This phase lasted approximately eleven minutes, and
as mentioned above, was reasonable based on Trooper
Owen's observation of the van exceeding the speed
limit. In the next phase of the stop, which lasted about
eight to nine minutes, Trooper Owen left Bueno in the
squad car, questioned Flores about the packages,
requested the shipping papers, and received Flores'
consent to search the van, resulting in the positive dog
alert. In the final phase of the stop, Trooper Owen and
other law enforcement agents searched the van,
recovered brick-shaped objects wrapped in plastic, to
which the dog again alerted for the presence of
narcotics, and handcuffed Bueno. This phase lasted
approximately twenty minutes.

Based on this timeline, we agree with Bueno that the
record shows that Trooper Owen prolonged the stop

beyond the time reasonably required to issue the written warning. Nevertheless, that a traffic stop extends beyond the time necessary to effectuate its purpose does not necessarily render it unreasonable. Rather, we and other courts have recognized several permissible grounds for prolonging a traffic stop after the original mission of the stop has been completed. First, continuation of the stop beyond its otherwise lawful limits is justified where the encounter has become consensual, thus terminating the seizure. *See e.g., United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007) ("A consensual encounter between an individual and a law enforcement official does not trigger Fourth Amendment scrutiny." (citation omitted)); *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) ("If the encounter becomes consensual, it is not a seizure, the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle." (internal quotation marks and citation omitted)). Here, the Government contends in passing that Bueno consented to remaining in the squad car after Trooper Owen issued him the written warning. We find that the record is less than clear on this issue, however, and given the underdeveloped nature of the Government's argument, we decline to find Bueno's continued detention permissible based on this ground.

We have also recognized that the prolongation of a traffic stop based on probable cause due to further questioning by a police officer is reasonable so long as the officer asks "[q]uestions that hold potential for detecting

crime, yet create little or no inconvenience." *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (en banc). In reaching this conclusion, we distinguished stops based on probable cause from those based on reasonable suspicion, and reasoned that because a stop based on probable cause will also justify a custodial arrest, traffic stops based on probable cause are not subject to the time limitations of *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Id.* at 952-53; *but see United States v. Guijon-Ortiz*, 660 F.3d 757, 768 n.9 (4th Cir. 2011) (rejecting the *Childs* court's discussion about "whether a stop supported by probable cause gives officers freer rein to ask unrelated questions than do stops supported only by reasonable suspicion" and affirming that the *Terry* two-step framework applies to traffic stops based on probable cause). Thus, as we explained in *Childs*, the Fourth Amendment "does not require the release of a person arrested on probable cause at the earliest moment that can be accomplished. What the Constitution requires is that the entire process remain reasonable." 277 F.3d at 953-54; *see also Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (citation omitted)). Based on this reasoning, we have permitted additional questioning by officers during a traffic stop that did not increase the length of detention, or that extended it by only a reasonable period of time. *See Childs*, 277 F.3d at 953; *United States v. McBride*, 635 F.3d 879, 883 (7th Cir. 2011).

The Government argues that the additional investigatory actions undertaken by Trooper Owen after he completed the written warning—phase two of the stop—fell within the permissible grace period we recognized in *Childs* because the conduct "[held] the potential for detecting crime, yet create[ed] little or no inconvenience." While we agree that Trooper Owen's actions clearly had the potential to uncover criminal activity, we are less convinced that the duration and manner of Bueno's detention that resulted caused him little or no inconvenience. This a fact-bound, context-specific inquiry, but we note that the defendants in *Childs*, *McBride*, and several of our unpublished decisions allowing the "reasonable" prolongation of a traffic stop were detained for, at most, a few minutes and not inconvenienced in any appreciable way. *See Childs*, 277 F.3d at 953 ("By asking one question about marijuana, officer Chiola did not make the custody of Childs an 'unreasonable' seizure."); *McBride*, 635 F.3d at 883 (noting that "the additional questions extended the stop by 'roughly two minutes' at most"); *United States v. Dixie*, 382 Fed. Appx. 517, 519 (7th Cir. 2010) (unpublished) (concluding that the stop was not unreasonably prolonged where the district court noted that it took "only seconds longer" for the officer to ask the defendant about any weapons on his person and then to recover the defendant's knife and unlicensed gun when he answered in the affirmative); *United States v. Brown*, 355 Fed. Appx. 36, 38-39 (7th Cir. 2009) (unpublished) (concluding that the defendant's detention was reasonable because the trooper's additional questioning "transpired in less

than one minute after he issued the warning"); *United States v. Johnson*, 331 Fed. Appx. 408, 409-10 (7th Cir. 2009) (unpublished) (noting that only two minutes passed between the time the defendant signed the written warning and his admission that someone smoked marijuana in the car that day, which provided an additional reason to prolong the stop); *but see United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (per curiam) (listing cases in which intervals longer than five or six minutes have been deemed tolerable); *United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006) (noting cases in which seizures of less than ten minutes were upheld as *de minimis* intrusions that did not amount to unreasonable seizures). In *United States v. Carpenter*, we permitted a delay in a traffic stop that lasted between zero and five minutes because it was only a "modest incremental delay" in the stop. 406 F.3d 915, 916-17 (7th Cir. 2005). Here, however, almost nine minutes passed—nearly doubling the length of the stop—between the issuance of the written warning and the dog alert that gave Trooper Owen reason to detain Bueno further. Additionally, although Trooper Owen had already issued Bueno the written warning, he advised Bueno to wait in the police squad car—with the police dog pacing at his back—while he questioned Flores.

Even if this amounted to an impermissible inconvenience, however, we conclude that the continuation of Bueno's detention beyond its otherwise lawful limits was justified in light of the circumstances that developed during the stop. We have recognized on numerous occasions that information lawfully obtained during a traffic

stop may "provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (citations omitted); *see also Figueroa-Espana*, 511 F.3d at 702 (holding that even if the defendant was detained, "such a detention was part of an extension of the initial traffic stop entirely justified by reasonable suspicion of criminal activity"); *McBride*, 635 F.3d at 882 (citing *Estrada v. Rhode Island*, 594 F.3d 56, 64 (1st Cir. 2010) (recognizing that information gathered during a stop may provide reasonable suspicion of criminal conduct that will justify extending the stop)). "Reasonable suspicion is more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000)). Whether it was reasonable for an officer to suspect that the defendant was engaged in wrongdoing "calls for an objective inquiry into all of the circumstances known to the officer at the time" he detained the defendant. *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011). This "'totality of the circumstances' test necessarily includes the experience of the law enforcement agent and the behavior and characteristics of the subject." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) (citing *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995)).

Here, the Government points to several facts and circumstances observed by Trooper Owen during the first phase of the stop that justified his decision to investigate

further. First, Trooper Owen noted that the van took "an abnormally long amount of time" to pull to the side of the road and that his experience taught him that this could be indicative of two people forming a plan or coordinating a story prior to police contact. The van was traveling at a high speed, however, and the squad car's video recording shows the van slowing at a reasonable rate, so we give this observation little weight. Trooper Owen also observed that both Bueno and Flores appeared "excessively" nervous during the stop: according to Trooper Owen, Bueno's hand trembled when he handed Trooper Owen his license; Flores' search for the van's registration was "hurried and exaggerated"; Flores' hand shook when he gave Trooper Owen the registration card; and Bueno's voice was shaky and weak at times and his leg was shaking when he was questioned in the squad car. Some nervousness around law enforcement officials is to be expected, however, and we have expressed skepticism regarding the value of such observations. *See United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005). Nevertheless, while "the appearance of anxiety may not by itself form an objective basis for suspecting criminal activity," *McBride*, 635 F.3d at 882 (citation omitted), we consider such behavior as a factor in the totality of circumstances, *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (citation omitted).

Other observations and information obtained by Trooper Owen before he finished giving Bueno the written warning provide a stronger basis for suspecting that he and Flores were engaged in illegal activity. Almost immediately after Trooper Owen initiated the

stop, he saw that the van was "loaded down" with boxes. Flores informed him that the boxes originated in Chicago and were bound for Mexico, which Trooper Owen knew from his experience was a common route for drug-trafficking and other contraband. *See United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 467 (7th Cir. 2005) (giving weight to fact that the claimant "was traveling to Phoenix, a recognized source city for illegal narcotics," in determining the existence of probable cause connecting the seized property with illegal drug transactions in a forfeiture case). Although Flores said that they were transporting the packages under the auspices of a transportation company, the van was registered to Flores, not the company, and bore no company markings as would be typical of a transportation company. Flores also admitted that he did not have any motor carrier authority to operate the business and transport the packages across state lines (he said he did not believe he needed any). Additionally, even though Flores said he was the owner of the transportation company and that both he and Bueno lived in Dallas, the business card he provided Trooper Owens listed a Chicago address. These circumstances obviously raised red flags regarding the legitimacy of Flores' transportation company, and when Trooper Owens questioned Bueno about the business while issuing him the written warning, he was unable to get specific answers regarding the origins and contents of the packages. Instead, Bueno told him only what the boxes typically contain and that "different people" dropped them off. He said that he was only the

driver, and that Flores maintained the shipping papers for the packages. We find that these developments, taken in combination, gave rise to a reasonable suspicion of criminal activity, and that Trooper Owen was justified in prolonging the stop for a few minutes to ask Flores about his business and the packages he was transporting in order to confirm or dispel his suspicions. *See McBride*, 635 F.3d at 882 (extended stop justified by nervousness of vehicle's occupants and their conflicting stories); *Figueroa-Espana*, 511 F.3d at 703 (prolonged stop supported by driver's nervous demeanor, inconsistent story, conflicting information, and failure to provide a driver's license or vehicle registration); *Muriel*, 418 F.3d at 726 ("By the time Sgt. McDonald had completed his work on the traffic stop, he had, by virtue of the inconsistent stories received from the occupants, reasonable suspicion to inquire further.").

We acknowledge that each of these independent facts has an innocent explanation. Money, clothing, and other items are regularly sent from the United States to Mexico. And almost every major city can be described as a destination or source for contraband. Nevertheless, our inquiry requires us to consider the totality of the circumstances, and "behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005). When viewed in combination, the demeanors of Bueno and Flores, the unknown contents and origins of the packages, their destination, and the way in which they

were being transported—by a transportation "business" that lacked any trappings of a legitimate business—gave rise to a reasonable suspicion of criminal activity that justified Trooper Owen's brief prolongation of the stop to investigate.[4] And we note that the additional investigation was brief: Trooper Owen's questions were

---

[4] The cases relied upon by Bueno, *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003), and *United States v. Jones*, 234 F.3d 234 (5th Cir. 2000), do not support a different result. In *Perkins*, a highway patrol officer detained the defendant after giving him a warning citation for a traffic offense "because of [the defendant's] nervousness," "what he perceived as [the defendant's] evasiveness in response to" questions he asked while running a check on the defendant's driver's license, and "his hunch that [the defendant] was being untruthful about his destination." 348 F.3d at 968. The Eleventh Circuit affirmed the granting of the defendant's motion to suppress, reasoning that more was required to give rise to reasonable suspicion than "the innocuous characteristics of nervousness, a habit of repeating questions, and an out-of-state license[.]" *Id.* at 970-71. Similarly, in *Jones*, the Fifth Circuit found no reasonable suspicion based solely upon inconsistent answers to certain employment questions and the defendant's admission that he had a prior arrest on drug charges. 234 F.3d at 241. Here, unlike in *Perkins* and *Jones*, Trooper Owen had more than "a hunch" based on the nervousness of Bueno and Flores when he continued Bueno's detention; he had a reasonable suspicion of criminal activity based on—in addition to the nervousness of Bueno and Flores—the unusual circumstances regarding Flores' purported transportation business, the origin and ultimate destination of the packages in the van, and the unknown contents of the packages.

focused on obtaining information regarding the shipping papers and contents of the packages, and Flores consented to the search of the van within minutes, leading to the positive dog alert.

Bueno also challenges the third phase of the stop, contending that it was unreasonable for him to be detained during the search of the car and that his arrest was not supported by probable cause. These arguments are also unavailing. Once the dog alerted to the presence of narcotics, Trooper Owen clearly had additional grounds to search the van and detain Bueno further. *See Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (positive dog alert would justify turning investigative detention into arrest); *United States v. Ganser,* 315 F.3d 839, 844 (7th Cir. 2003) ("Once the canine alerted to the letter, reasonable suspicion was elevated to probable cause." (citations omitted)); *United States v. Thomas,* 87 F.3d 909, 912 (7th Cir. 1996) (dog's positive reaction to narcotics establishes probable cause). And his continued detention—we will assume it was an arrest at this point—was supported by probable cause. "Probable cause means that there are 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)).

By the time Bueno was placed in handcuffs, the search of the van that Bueno had been driving had revealed a box containing brick-shaped objects wrapped in plastic. Trooper Owen stated that the wrapping had an appearance consistent with that of contraband. *See United States v. Reed*, 443 F.3d 600, 604 (7th Cir. 2006) ("It is common for [currency related to illegal drug transactions] to be wrapped in cellophane so as to minimize the ability for a drug-sniffing dog to detect the drug residue often found on such currency[.]"). Additionally, despite the plastic wrapping, the narcotics dog positively alerted to the box for the presence of narcotics odors. When viewed in combination with the circumstances discussed above, these developments were sufficient to support a reasonable belief that Bueno was involved in criminal activity. *See id.* at 603-04 (finding probable cause to arrest based on inconsistent stories, evasiveness in answering questions, prior drug arrests, and the discovery of large amounts of currency "concealed in a manner that is typical for currency related to illegal drug transactions[]"). Contrary to Bueno's arguments, we do not believe that Trooper Owen needed to open the plastic-wrapped objects to confirm the contents as he was entitled to rely on his "common-sense judgment," *id.* at 603, and probable cause does not require law enforcement officials to gather enough evidence to support a conviction or even enough to demonstrate that it was more likely than not that the suspect was engaged in criminal activity. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (citation omitted). As we have said before, "[o]ne can always point out informational gaps,

yet the probable cause inquiry asks what a law enforcement officer knew rather than what he did not." *Slone*, 636 F.3d at 849. "If an officer had in every case to observe an illegal act before effecting an arrest, the test would be called certain cause, or more-likely-than-not cause, two formulations that have been rejected." *Id.* at 850 (citations omitted).

Seeking to avoid this result, Bueno attempts to distance himself from the events that occurred while he sat in the squad car. He concedes that the dog's positive alert and Flores' consent to search provided grounds to detain the car and Flores—the owner of the car—but contends that there was "no reason" to continue to detain him at the scene. We disagree. Bueno's arguments allude to the notion that a person's "mere propinquity" to others independently suspected of criminal activity is insufficient to support probable cause as to that person as well. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1978) (holding that officers executing a warrant on a tavern lacked probable cause to search all patrons of that tavern at the time); *see also United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990) ("[P]hysical proximity to a suspected crime, without indicia of [the defendant's] involvement, is insufficient to support a finding of probable cause." (citation omitted)). But as the Supreme Court has noted, "a car passenger . . . will often be engaged in a common enterprise with the driver[.]" *Maryland v. Pringle*, 540 U.S. 366, 373, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). In *Pringle*, the Supreme Court held that it was reasonable for the officer to infer a common enterprise among the three

occupants of a car because the drugs and cash found in the car were accessible to all three men in the car, and "[t]he quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." *Id.*

We find that the totality of the circumstances in this case similarly supports an inference of a common enterprise between Bueno and Flores. Bueno was not merely a passenger, but rather the driver of the car to which the dog positively alerted and where the box of plastic-wrapped objects was found. He told Trooper Owen that he had been working for Flores for a year, and was involved in the loading of the boxes. Moreover, the trip they were taking was long—Chicago to Dallas—and one that he and Flores had made together on numerous occasions. *See Reed*, 443 F.3d at 604-05 ("This was not a quick trip to the grocery store in which Reed was an unwitting passenger. This was a trip out of state. It is less likely that an innocent person would be allowed to accompany persons for such a trip."). These circumstances provided Trooper Owen with particularized reasons to believe that Bueno was involved in criminal activity even though he was not the owner of the van. Accordingly, the entirety of Bueno's detention caused by the traffic stop was justified, and the district court correctly denied his motion to suppress.[5]

---

[5] Bueno also argues that the district court should have held an evidentiary hearing on his motion to suppress. The only

(continued...)

## B. Gonzalez-Zavala

Gonzalez-Zavala appeals his sentence. He contends that the evidence was insufficient to sustain the application of the enhancements under U.S.S.G. §§ 2D1.1(b)(12) and 2D1.1(b)(14)(E) and also challenges the district court's findings regarding his support of his family in Mexico.[6] We generally review factual findings for clear error, and the interpretation and application of the Sentencing Guidelines *de novo*. *United States v. Rollins*, 544 F.3d 820, 837 (7th Cir. 2008) (citations omitted). Here, however, Gonzalez-Zavala did not raise these objections before the district court, so our review is for plain error. *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010)

---

[5] (...continued)
disputed issue of fact he identifies, however, is whether the DEA agents communicated with Trooper Owen prior to his stop. This disputed fact bears only on whether the district court erred in relying on the collective knowledge doctrine in denying Bueno's motion to suppress without a hearing, *see United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) , and as we affirm on other grounds, we deny Bueno's request for a remand for an evidentiary hearing.

[6] Gonzalez-Zavala also argues that the application of the enhancements, which became effective after the issuance of the indictment charging him, violates the ex post facto clause of the Constitution. As he concedes, however, our precedent forecloses that claim. *E.g., United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011); *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006).

(citations omitted); *see also* Fed. R. Crim. P. 52(b).[7] Applying this standard, we will reverse the determination of the district court only if we find: "(1) an error or defect (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *Anderson*, 604 F.3d at 1002 (quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

Regarding Gonzalez-Zavala's first argument, we find no clear error in the district court's application of the enhancements under U.S.S.G. §§ 2D1.1(b)(12) and 2D1.1(b)(14)(E). Section 2D1.1(b)(12) calls for an enhancement where a defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." At his change of plea hearing, Gonzalez-Zavala admitted that he had been a leader of the Chicago cell from December 2008 to June 2009, and that his "oversight of the Chicago distribution cell included obtaining and maintaining stash houses for the purpose of storing cocaine and cash drug proceeds." He also admitted to

---

[7] The Government contends in passing that Gonzalez-Zavala waived these arguments, but offers no strategic reason for the failure of Gonzalez-Zavala's counsel to object. As "[w]aiver principles must be construed liberally in favor of the defendant," *Anderson*, 604 F.3d at 1002 (citation omitted), and we "assume forfeiture where the government fails to proffer a strategic justification for a defendant's decision to bypass an argument," *United States v. Johnson*, 668 F.3d 540, 542 (7th Cir. 2012) (citation omitted), we will review for plain error.

maintaining two specific stash houses in Plainfield and Joliet where drugs and drug proceeds were found on the day of his arrest. The PSR provided similar details regarding Gonzalez-Zavala's role in the Chicago cell and the stash houses, and Gonzalez-Zavala did not have any objections to the PSR and declined to suggest any changes or corrections when offered the opportunity to do so at his sentencing hearing. Given these admissions and his failure to object to the PSR's findings, the district court did not clearly err in finding the evidence sufficient to support this enhancement. Gonzalez-Zavala points out that the district court did not specifically inquire into the factors listed in the commentary to the Guidelines, *see* U.S.S.G. § 2D1.1, cmt. n.28, but we do not believe that such a discussion was necessary given Gonzalez-Zavala's failure to object to the findings in the PSR and his admission that as a leader of the Chicago cell, a position he held for at least seven months, he "obtained and maintained" several stash houses for "the purpose of storing cocaine and cocaine proceeds." While we can easily envision closer cases in which the defendant objects to the enhancement and a more detailed examination of the factors set forth in the commentary may be required, this was not a close case.

Gonzalez-Zavala's challenge to the application of the U.S.S.G. § 2D1.1(b)(14)(E) enhancement also fails. Section 2D1.1(b)(14)(E) provides for a two-level enhancement to a defendant's offense level where (1) the defendant committed the offense as part of a pattern of criminal conduct, and (2) the defendant engaged in the criminal conduct as a livelihood. *See* U.S.S.G. § 2D1.1(b)(14)(E).

Gonzalez-Zavala argues that the district court erred under both prongs.

The commentary to the Guidelines states that "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning given to those terms in U.S.S.G. § 4B1.3. U.S.S.G. § 2D1.1, cmt. n.29. The commentary to U.S.S.G. § 4B1.3 defines "pattern of criminal conduct" as "planned criminal acts occurring over a substantial period of time." U.S.S.G. § 4B1.3, cmt. n.1. Gonzalez-Zavala contends that the evidence before the district court did not support a finding that his conduct was of a sufficient duration to support the enhancement. We disagree. Gonzalez-Zavala admitted to participating in the conspiracy to distribute drugs from at least 2007 through June 2009, and he was a leader of the Chicago cell for at least seven months of that period. Given this admission, it was not clear error for the district court to find that Gonzalez-Zavala's conduct occurred over a "substantial period of time."

Gonzalez-Zavala also argues that the evidence was insufficient to support a finding that he "engaged in" the conspiracy to distribute drugs "as a livelihood." Under the commentary to U.S.S.G. § 4B1.3, "engaged in as a livelihood" means:

> (1) that the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (2) the totality of the circum-stances shows that such criminal conduct was the defendant's primary occupation in that twelve

> month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for his criminal conduct).

U.S.S.G. § 4B1.3, cmt. n.2. Gonzalez-Zavala points out that neither the Government nor the PSR identified exactly how much he earned while participating in the conspiracy. Given the other undisputed facts before the district court, however, we cannot conclude that it clearly erred in finding that Gonzalez-Zavala earned more than $13,100 during at least one twelve-month period in which he was involved in the conspiracy.[8] During at least seven months of that period, Gonzalez-Zavala was a leader of the Chicago cell's multimillion dollar drug distribution operation and he admitted to personally supervising the collection of over $5.7 million in drug proceeds and the distribution of over 420 kilograms of cocaine. In this role, he coordinated the delivery of cocaine to wholesale distributors, the collection of payments, the return of the proceeds via couriers to the Organization in Mexico, and the maintenance of several stash houses. The PSR specifically lists ten occasions on which Gonzalez-Zavala was involved in collecting drug proceeds in quantities ranging from

---

[8] Although the dates do not line up precisely, we used $6.55, the federal minimum wage effective from July 24, 2008, through July 24, 2009, for this calculation. United States Dept. of Labor, *History of Federal Minimum Wage Rates Under the Fair Labor Standards Act, 1938-2009*, http://www.dol.gov/whd/minwage/chart.pdf (last visited January 2, 2013).

$28,000 to $165,000. These same facts regarding his role in the Chicago cell and the scope of his duties support the finding that Gonzalez-Zavala's participation in the drug distribution conspiracy was his primary occupation, notwithstanding his unverified claim that he worked as a self-employed landscaper during this time.

We likewise find no error in the district court's findings regarding Gonzalez-Zavala's support of his family in Mexico. In evaluating the factors under 18 U.S.C. § 3553(a), the district court discussed the letters and pictures from Gonzalez-Zavala's family and concluded that:

> With all the access [Gonzalez-Zavala] had to funds as a result of this enterprise, his family still suffered, so that despite the fact that he is going to be away from his family for years, and maybe life, the family quite frankly is probably better off than to have a person who has access to means and they still suffer those kinds of circumstances.

Gonzalez-Zavala contends that the district court committed procedural error by relying on clearly erroneous facts in reaching this conclusion. "We will disturb the district court's findings as clearly erroneous only if our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. Selvie*, 684 F.3d 679, 682 (7th Cir. 2012) (internal quotation marks and citations omitted).

Gonzalez-Zavala challenges two findings the district court relied upon in determining his sentence: (1) that Gonzalez-Zavala had access to substantial funds as a result of his involvement in the Organization, and (2) that

he did not provide "much, if any" support to his family despite his access to those funds. The record here does not convince us that the district court clearly erred regarding either finding. As to the first finding, as our discussion above indicates, there was ample support for the conclusion that Gonzalez-Zavala had access to significant dollars as a leader of the Organization's large drug distribution cell in Chicago. The evidence before the district court likewise supported the finding that Gonzalez-Zavala's family suffered economically while he was in the United States. Specifically, in the letter largely devoted to discussing her family's economic woes, Gonzalez-Zavala's wife wrote, "We were doing okay when [Gonzalez-Zavala] lived with us but unfortunately, he left my children and I." Gonzalez-Zavala concedes that this statement "could be read to mean that Gonzalez-Zavala abandoned his family to seek riches in the United States," but argues that the more accurate inference from the letter is that Gonzalez-Zavala's family missed his emotional support when he left for the United States. Given that even Gonzalez-Zavala recognizes that the district court chose from one of two permissible interpretations of the letter, we will not disturb the district court's finding as clearly erroneous.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Bueno's motion to suppress and AFFIRM Gonzalez-Zavala's sentence.

1-7-13